AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California ▾

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Pink iPhone<br>Item No. I24-CBP-SND-24798-1<br>( "Target Device" ) | )<br>)<br>)<br>)<br>)<br>) |

Case No.   25mj2580

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❐ contraband, fruits of crime, or other items illegally possessed;

❐ property designed for use, intended for use, or used in committing a crime;

❐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. Sec. 1324, 18 U.S.C. Sec. 371 | Bringing in aliens for financial gain and conspiracy |
| 18 U.S.C. Sec. 201 | Receipt of bribes by a public official |

The application is based on these facts:

See attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

❐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Aurora Rodriguez*
_____
*Applicant's signature*

HSI SA Aurora Rodriguez
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: ___ May 13, 2025 ___

_____
*Judge's signature*

City and state: San Diego, California

Hon. Steve B. Chu, U.S. Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

> Pink iPhone
> Item No. I24-CBP-SND-24798-1
> (**"Target Device"**)

The **Target Device** is currently in the possession of Department of Homeland Security (DHS) Homeland Security Investigations (HSI) located at 880 Front Street, Suite 3200, San Diego, California 92101.

**ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of February 2, 2025, up to and including May 2, 2025:

    a.    tending to indicate efforts to facilitate the smuggling of undocumented aliens from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers used to facilitate the smuggling of undocumented aliens from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in smuggling of undocumented aliens from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the smuggling of undocumented aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain; and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official.

## AFFIDAVIT

I, Special Agent Aurora Rodriguez, being duly sworn, hereby state as follows:

### INTRODUCTION

1.    I submit this affidavit in support of applications for warrants to search the following electronic device:

Pink iPhone 15

Item No. I24-CBP-SND-24798-1

("**Target Device**")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain, and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official, as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Kairy QUINONEZ ("Defendant"). **Target Device** is in the possession of Department of Homeland Security (DHS) Homeland Security Investigations (HSI) located at 880 Front Street, Suite 3200, San Diego, California 92101.

2.    The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other agents regarding this investigation.  All dates and times described are approximate.

### BACKGROUND

3.    I am a Special Agent with Homeland Security Investigations (HSI) and have been so employed since August of 2021. I am currently assigned to the San Diego Field Office as a Task Force Agent (TFA) with the Department of Homeland Security (DHS) Office of Inspector General (OIG). I am assigned to investigate criminal organizations that are associated to border corruption, including bribery, drug trafficking, and human smuggling. Before my employment as a Special Agent with HSI, I was a Customs and

Border Protection Officer (CBPO) for three years.

4.      During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California, as well as human smuggling into and through this District. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking and human smuggling investigations, I have knowledge of the operational habits of narcotics traffickers and human smugglers.

5.      During my tenure as a CBPO, I was responsible for inspecting travelers and vehicles to ensure compliance with, among other things, customs, immigration, and agricultural laws and regulations, as well as detecting and preventing illegal activities like terrorism, smuggling, human trafficking, drug trafficking, and illegal migration while simultaneously facilitating the flow of legitimate trade and travel. I also participated in the investigation of cases involving the smuggling of aliens from Mexico into the United States.

6.      I have participated in investigations involving the use of cellular devices to coordinate and communicate aspects of corrupt activity and sharing sensitive information pertaining to law enforcement. I have experience in interviewing confidential informants, witnesses, targets under investigation, executing arrest/residential warrants, conducting surveillance, and other variety of investigative techniques. I have worked and consulted with numerous federal agents who have investigated border corruption, narcotics trafficking, and human smuggling throughout the United States.

7.      Through the course of my training, experience, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers, in particular those who attempt to smuggle aliens into the United States from Mexico. I am aware that it is a common practice for illicit alien smugglers to work in concert with other individuals and to do so by using cellular telephones. Because they are mobile, the use of cellular telephones permits illicit alien smugglers to easily carry out

various tasks related to their smuggling activities, including, for example, remotely monitoring the progress of aliens while in transit, providing instructions to smugglers, warning accomplices about law enforcement activity, discussing with co-conspirators the payments of money in exchange for acts in furtherance of the conspiracy, and communicating with co-conspirators who are transporting aliens and/or proceeds from alien smuggling.

8.    Cellular telephones enable such individuals to maintain contact with criminal associates and coordinate with them. As such, those devices can store information about key locations, including the location of stash houses and homes of associates. They also can store, among other things, messages referring to the illicit arrangements and the payment of monies related to those arrangements, the names and contact information of associates, and photographs reflecting human smuggling activity.

9.    Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.    This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a.  tending to indicate efforts to facilitate the smuggling of undocumented aliens from Mexico into the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of undocumented aliens from Mexico into the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in smuggling of undocumented aliens from Mexico into the United States;

d.  tending to identify travel to or presence at locations involved in the smuggling of undocumented aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the **Target Device**(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10.  Beginning in September 2024, OIG identified several reactive alien-smuggling defendants that each asserted that he had been directed to cross through the San Ysidro Port of Entry (POE) through a particular lane during a particular hour-long period. This was because, they stated (or at least alluded to), the group they were working with had a United States Customs and Border Protection Officer (CBPO) working for them.

11.  Based on review of those defendants' crossing histories, telephone evidence, and other material, both Farlis ALMONTE and Ricardo RODRIGUEZ were identified as corrupt CBPOs working for this group. Subsequent review of other crossing records reflected that both ALMONTE and RODRIGUEZ often admitted into the country several other cars with multiple visible passengers, but they documented that only the driver was in the car.

12.  ALMONTE and RODRIGUEZ were later arrested on March 24, 2025, and charged by complaint, and then information, for conspiring to bring in aliens for financial

gain, substantive counts for bringing in aliens for financial gain, and receipt of bribes by a public official. *See* 25-CR-1321. During his post-arrest interview, RODRIGUEZ admitted to the conduct and described, for example, how he would share his lane assignments with his coordinator and admit alien-laden vehicles into the United States for money. RODRIGUEZ also implicated QUINONEZ as being involved in the smuggling, too.

13.    Further investigation, including review of evidence from RODRIGUEZ's cell phone and POE records like videos, photographs, and TECS records, shows that QUINONEZ was involved with at least four alien smuggling events beginning on March 2, 2025.

14.    Based on the information described in this Affidavit, I request permission to search the **Target Device** for data beginning on February 2, 2025, one month before QUINONEZ first admitted an alien-laden motorcycle into the United States without meaningful inspection, up to and including May 2, 2025, the day QUINONEZ was arrested.

### *Events Leading to Arrests of ALMONTE and RODRIGUEZ*

Evidence of ALMONTE and RODRIGUEZ conspiring with others to bring in aliens for financial gain—that led to their arrests in late March—is presented here as a function of three reactive arrests at the POE, including statements by those defendants and phone evidence, as well as other abnormal events at the POE and abnormal cash deposit activity.

### *Arrest of REACTIVE DEFENDANT #1*

15.    At about 2:30 a.m. on September 5, 2024, REACTIVE DEFENDANT #1 drove into the United States through lane 5 at the POE as the sole visible occupant of his white BMW. CBPO Quach was assigned to the lane, and after a cursory inspection, he found two people hiding under a blanket in the rear. The pair were later determined to be aliens without documents allowing them to enter or remain in the United States.

16.    In his post-arrest statement, REACTIVE DEFENDANT #1 admitted to the smuggling, adding that a person was to pay him $7,000 for it. That person, REACTIVE DEFENDANT #1 added, told him to cross through lane 5 between 2:00 a.m. and 3:00 a.m. and that a black male officer, who the group already paid, would be working the lane. But

1    when REACTIVE DEFENDANT #1 approached the lane, an Asian officer was working the
2    lane instead. (ALMONTE appears to be of Dominican descent.)

3        17.    Evidence recovered from REACTIVE DEFENDANT #1's phone corroborated
4    his statements. In a screenshot of a WhatsApp message thread with what appears to be his
5    smuggling coordinator, the coordinator explained to REACTIVE DEFENDANT #1 that "It's
6    two that are working … with me" and that one was "coming to Tijuana after getting off work"
7    so he could "introduce" REACTIVE DEFENDANT #1 to him. In a separate screenshot of a
8    WhatsApp message thread between a contact saved as "Farli Usa" (ALMONTE's first name
9    is "Farlis") with an unidentified party (believed to his coordinator), "Farli Usa" explained that
10   he "did not get more shifts" but discussed his upcoming shift from 2:00 p.m. to 10:00 p.m.,
11   adding that he saw the "driver" who was wearing a hat and driving a white BMW. (During
12   REACTIVE DEFENDANT #1's relevant crossings, he drove his white BMW while wearing
13   a hat.)

14       18.    REACTIVE DEFENDANT #1 otherwise had three relevant other crossings into
15   the United States: August 17, 2024, through RODRIGUEZ's lane, August 24, 2024, through
16   ALMONTE's lane, and again on August 29, 2024, through RODRIGUEZ's lane. REACTIVE
17   DEFENDANT #1 has identified each of these dates as dates when he was illegally crossing
18   aliens.

19       19.    About 90 minutes after REACTIVE DEFENDANT #1 was detained on
20   September 5, ALMONTE, working a different primary booth at the POE, queried REACTIVE
21   DEFENDANT #1, his car, and the smuggled persons through a CBP system documenting
22   several pieces of information, including seizure data. Because REACTIVE DEFENDANT #1
23   was not seeking admission through ALMONTE's lane at the time, ALMONTE appeared to
24   have no legitimate reason to make those queries.

25       ***Arrest of REACTIVE DEFENDANT #2***

26       20.    At about 12:30 p.m. on September 25, 2024, REACTIVE DEFENDANT #2
27   drove into the United States through lane 17 at the POE with only an adult female passenger
28   visible. But at the primary booth, REACTIVE DEFENDANT #2 provided his ID and only a

male's ID on behalf of his passenger. The CBPO noticed this discrepancy and detained them. The adult female then alerted the CBPO to her two kids hidden in the rear of the car. All three were later determined to be aliens without documents allowing them to enter or remain in the United States.

21.     Post-arrest, REACTIVE DEFENDANT #2 admitted to the smuggling in exchange for $3,000, adding he was told by his recruiter that the group was working with a CBPO at the POE. Evidence recovered from REACTIVE DEFENDANT #2's phone showed that, approximately 45 minutes before he entered the country, REACTIVE DEFENDANT #2 was directed to enter lane 16 at the POE: The other party told him that "You already know 16" and to "Erase everything."

22.     But when REACTIVE DEFENDANT #2 entered the POE, he entered through lane 17. ALMONTE, meanwhile, was manning the primary booth at lane 16 at the time. Two days after REACTIVE DEFENDANT #2 was arrested, ALMONTE queried the same CBP system for both REACTIVE DEFENDANT #2 and the car he was driving, again without any apparent legitimate purpose.

### Arrest of REACTIVE DEFENDANT #3

23.     At about 9:30 p.m. on December 6, 2024, REACTIVE DEFENDANT #3 entered the United States through the POE in a car with four other people. While lined up to enter through lane 16 (ALMONTE was manning that primary booth at the time), a CBPO in pre-primary approached the car and, when presented with IDs for the occupants, noticed that the documents did not appear to have been issued to the passengers. Those four were later determined to be aliens without documents allowing them to enter or remain in the United States, and REACTIVE DEFENDANT #3 was arrested.

24.     During his post-arrest statement, REACTIVE DEFENDANT #3 admitted to the smuggling, stating that he was to be paid $1,000 and was told to go through lane 16 that day because the group had a CBPO at the POE working for them. REACTIVE DEFENDANT #3 also admitted to smuggling on behalf of the group earlier, too.

25.     Subsequent review of REACTIVE DEFENDANT #3's earlier crossings showed that he often entered the POE through lanes manned by ALMONTE or RODRIGUEZ. In those crossings, despite having at least one other visible occupant in the car, ALMONTE or RODRIGUEZ documented in crossing records that only the driver was present. For example, TECS records show that on October 15, 2024, REACTIVE DEFENDANT #3 entered the POE through lane 15, manned by RODRIGUEZ. A passenger is clearly visible seated next to REACTIVE DEFENDANT #3, but RODRIGUEZ entered only REACTIVE DEFENDANT #3's information into TECS. Similarly on November 12, 2024, REACTIVE DEFENDANT #3 entered the POE through lane 17, again manned by RODRIGUEZ. Several passengers are clearly visible in the car, but RODRIGUEZ again entered only REACTIVE DEFENDANT #3's information into TECS.

26.     Then on November 28, 2024, REACTIVE DEFENDANT #3's car was lined up to enter the POE through lane 14. Despite being relatively close to that primary booth, the car then reversed out of that lane, forcing two other cars to reverse out of the way, before maneuvering to line up for lane 15, manned by RODRIGUEZ.

27.     Again, several people (at least three) can be seen in the car along with REACTIVE DEFENDANT #3 when he entered the country. But RODRIGUEZ entered only REACTIVE DEFENDANT #3's information into TECS. REACTIVE DEFENDANT #3 has admitted that he was smuggling aliens on that date.

***ALMONTE Allows Entry of Car with TECS Alert Without Sending to Secondary***

28.     On December 6, 2024, a white Honda sedan with an active TECS alert on its license plate entered the POE through lane 16, manned by ALMONTE. The TECS alert generated a mandatory referral to secondary inspection of the car. But ALMONTE instead allowed the car to enter the United States without going to secondary inspection.

29.     Shortly thereafter, ALMONTE contacted the vehicle secondary lot supervisor and asserted that he (ALMONTE) had received a "system error" on his primary terminal regarding the license plate of a white car. ALMONTE added that there was not a white car at his booth when the alert populated, asserting instead that there was only a blue car present and that it was

not the same car that generated the TECS alert.

30.     But TECS records show otherwise. The white sedan with the license plate tied to the TECS alert can be seen in photographs as it approached ALMONTE's booth at the time. ALMONTE otherwise inputted only an "unknown" number of passengers in the car for the vehicle encounter.

31.     Review of records show that this car had five prior crossings into the United States between late October 2024 and early December. Each prior crossing was processed either by ALMONTE or RODRIGUEZ, and each was suspicious: Photographs show that the driver, who appeared to be young, presented an ID for a 62-year-old man as his own, and that multiple occupants were visible in the car but only the driver was inputted into TECS.

***Cash Deposit Activity***

32.     Both ALMONTE and RODRIGUEZ, in bank accounts they maintain, deposited abnormal amounts of cash in the latter half of 2024.

33.     In the year-and-a-half period before mid-August 2024, ALMONTE appeared to deposit only about $1,600 in cash into his account through about five transactions. No deposit exceeded $700. But beginning in late August 2024 and through late November 2024 (a three-month period), he appeared to deposit almost $22,000 in cash into his account broken out into small deposits. And some of those deposits—like on September 26 and November 17—were made on the same day.

34.     Similarly, while RODRIGUEZ had no cash deposits to his account between January 2023 and early May 2024, beginning on May 11, 2024, and through late November (a six-month period), he appeared to deposit almost $24,000 into his account, also broken out into small deposits.

35.     In my training and experience and conversations with other officers, I am aware that corrupt officers often get paid in cash and then deposit the criminal proceeds in smaller amounts and sometimes across several bank accounts.

***Arrests of ALMONTE and RODRIGUEZ***

36.     On March 24, 2025, law enforcement arrested ALMONTE and RODRIGUEZ

for bringing in aliens for financial gain, conspiracy, and receipt of bribes by a public official. During his post-arrest statement, RODRIGUEZ admitted to working with an alien smuggling organization to facilitate the entry of aliens into the United States through the primary lanes he was working at the POE. He added, for example, that he would share with his co-conspirators his lane assignments and that his co-conspirators would then send him information about the alien-laden cars that were going to enter through his lane. And in exchange for doing this, RODRIGUEZ added, he was paid thousands of dollars per car.

37.    RODRIGUEZ then added that, after he had resigned from CBP in late January 2025, he had recruited another CBPO, QUINONEZ, to similarly allow undocumented aliens into the United States through the lane she was assigned to on behalf of the organization. QUINONEZ, he added, was his former roommate before he resigned from CBP. RODRIGUEZ added that QUINONEZ first agreed to help smuggle aliens on behalf of the organization around March 2, 2025.

38.    Evidence from RODRIGUEZ's cell phone, along with evidence from the POE like video, photographs, and TECS records, show that QUINONEZ appeared to help with at least four alien smuggling events at the POE in March 2025.

***Two Smuggling Events on March 2, 2025***

39.    The afternoon of March 2, 2025, POE video shows that a motorcycle arrived to the primary booth manned by QUINONEZ, with two people. But upon arrival, audio from the booth reflects that one of the persons called out "five seven" (in Spanish) to QUINONEZ and handed her documents. QUINONEZ then failed to scan or enter the documents into TECS, the motorcycle's license plate was not entered into the system, and she manually canceled the crossing package.

40.    And just a few minutes earlier, just behind the motorcycle in QUINONEZ's lane, a human narcotics detection dog alerted to a pickup truck that had eight aliens hidden in the bed. The driver of that truck, a Mexican citizen without crossing privileges, had a BCC card on him issued to another person. TECS records show that this BCC card was used in at least one earlier alien smuggling event that ALMONTE processed at the POE.

Other records from a WhatsApp PRTT concerning a number used by one of the coordinators identified by the earlier reactive defendants indicate that, shortly before the driver of this truck entered the POE, he began to share his live location with that coordinator. And about a half hour after QUINONEZ's shift on the primary lane ended, she messaged RODRIGUEZ (from a number subscribed to her), appearing to reference that smuggling event when she wrote "PPK 1045," believed to be referring to a pre-primary K-9 alert for alien smuggling.

41. The next day, RODRIGUEZ messaged QUINONEZ again, appearing to discuss the smuggling group wanting to work with her more. He first told her that, "I talked to them. They are desperate" to which QUINONEZ replied, "Who? Bro. Telephone," appearing to suggest that the pair instead talk only in a phone call instead of text messaging. RODRIGUEZ then told her that "I told them that they need you. You don't need them."

***Two Smuggling Events on March 16, 2025***

42. About 15 minutes before QUINONEZ's first shift on the primary lane on March 16, RODRIGUEZ messaged with his girlfriend (at a number RODRIGUEZ indicated belonged to her), appearing to discuss the same keyword "five seven" that the smugglers were to use. His girlfriend asked RODRIGUEZ, "What keyword should they use or what" and that "Chuy said he/she told him 57." RODRIGUEZ then confirmed, "Yes, 57" and his girlfriend confirmed that "they are going to take off then." (On March 2, one of the persons on the motorcycle crossing through QUINONEZ's lane, as described above, called out to QUINONEZ "five seven.") The pair then continued to talk about "Chuy heading over there."

43. While RODRIGUEZ and his girlfriend continued to message each other, a motorcycle with two people on it entered QUINONEZ's lane at 5:35 p.m. QUINONEZ again did not document either traveler into TECS, did not enter the license plate into the system, and manually canceled the package.

44. An hour later, his girlfriend messaged RODRIGUEZ, asking "Did Kairy call you already?" (QUINONEZ's first name is Kairy.) RODRIGUEZ then told his girlfriend

to "send them with the passport cards" and that "Kairy prefers them that way" and to "explain to them well how to do it." His girlfriend replied that "Yes, those are the same ones that Chuy and the guy used to cross." Around 7:15 p.m., RODRIGUEZ stated in a voice message that he was "going to head down to wait for the other one to cross." His girlfriend then asked whether "they should just show them [believed to be a reference to admission documents] with the picture inside the envelope showing just a portion of the card?"

45.    Then at about 7:35 p.m., another motorcycle entered the POE through QUINONEZ's lane with two people on it. QUINONEZ again failed to scan their documents for admission, did not enter the motorcycle's license plate into TECS, and did not generate a crossing package for the motorcycle. (The LPR otherwise appeared to have failed to recognize the license plate in the first instance.) Three hours later, RODRIGUEZ's girlfriend messaged RODRIGUEZ that the "guy we brought across posted a picture over there already hahahaha" to which RODRIGUEZ replied with a laughing emoji.

46.    Two weeks later, RODRIGUEZ and his girlfriend continued to message with each other, discussing the coordinator in Mexico, QUINONEZ, and ALMONTE. RODRIGUEZ first messaged that ALMONTE had called him the night before and that ALMONTE was out drinking with the coordinator. His girlfriend then confirmed ALMONTE's number with RODRIGUEZ before asking, "Does Farly know that Kairy works here," believed to be a reference to the smuggling organization. RODRIGUEZ replied, "Who knows" and that he was "not sure" whether he told him [believed to be a reference to ALMONTE] about it."

### *Arrest of QUINONEZ*

47.    On May 1, 2025, a federal grand jury returned an indictment charging, among others, QUINONEZ with conspiracy to bring in aliens for financial gain, in violation of Title 18, U.S.C., § 371 and Title 8, U.S.C., § 1324(a)(2)(B)(ii), as well as three substantive counts for bringing in aliens for financial gain, in violation of Title 8, U.S.C., § 1324(a)(2)(B)(ii).

48.     The morning of May 2, 2025, law enforcement arrested QUINONEZ at the POE on the related arrest warrant. Just before QUINONEZ was arrested, she was holding the **Target Device** in her hand before placing it on the desk when agents approached her. QUINONEZ later confirmed that the **Target Device** belongs to her. She also confirmed her number as the same one that is subscribed to her, described above.

49.     Based upon my training and experience, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this Affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that QUINONEZ was using the **Target Device** to communicate with others to further the smuggling of undocumented aliens into the United States.  Further, in my training and experience, alien smugglers may be involved in the planning and coordination of an alien smuggling event in the days and weeks prior to an event and may continue to discuss prior and upcoming events in the days and weeks that follow.

50.     Based upon my training and experience, it is also not unusual for individuals, like QUINONEZ, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim.

51.     Accordingly, I request permission to search the **Target Device** for data beginning on February 2, 2025, one month before the first known smuggling event through QUINONEZ's lane at the POE, up to and including May 2, 2025, the day QUINONEZ was arrested.

## METHODOLOGY

52.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be

simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

53.    Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

54.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

55.     Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

56.     Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device** will yield evidence of QUINONEZ's violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain; and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official.

57.     Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Aurora Rodriguez*
Special Agent Aurora Rodriguez
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 13th day of May 2025.

HONORABLE STEVE B. CHU
UNITED STATES MAGISTRATE JUDGE